LEONARD MARCH, Executor, *versus* JACOB GARLAND.

To charge an indorser, the day on which notice was placed in the postoffice addressed to him should be made certain.

Where the person by whom *notice* of the non-payment of a draft was sent to the indorser, was uncertain as to which of two places the same was directed, but it appeared that he was correctly informed on the day the notices were sent, of the residence of such indorser; and that the indorser had said he knew, or had notice that the *draft* had come back, it was held, that the jury were justified in finding the notice to have been properly directed.

THIS was an action against the defendant, as indorser of a draft dated July 1, 1836, payable in sixty days, at the Suffolk bank, Boston, drawn by S. & G. Turner & Co. on Nath'l Fifield, and by him accepted.

The plaintiff, to prove his claim, introduced the notarial protest of Wm. Stevenson, by which it appeared, among other things, that he sent notice of the non-payment of the draft in suit to the drawers, the first indorser, and accepter, enclosed to John Wyman, cashier, per mail, to Bangor.

The plaintiff then called John S. Ricker, who testified that he was a clerk in the Mercantile bank, Bangor; that on the 5th or 6th of September, 1836, although he was not positive as to the day, he received from Samuel Harris, cashier of the same bank, certain notices to be delivered, signed by Wm. Stevenson, notary public, and by said Stevenson directed on the inside, one of which was addressed to the defendant; that he sealed it up and put it in the postoffice, Bangor, directed to the defendant either at Bangor or China, he could not state which, but thinks it was China; that he inquired of Moses Patten, Jr. where the defendant resided; that Patten was not certain as to his place of residence; and that independently of the protest and of a record of the names of persons to whom notices were to be sent, which he kept, he had no recollection whatever as to the time.

Henry Warren, who was called by the plaintiff, testified that he was in the Mercantile bank in the early part of September, 1836, as he thought, and that while there he recollected that John Wyman, cashier of the Penobscot bank, came in and left

papers resembling a protest and notices; that observing the name of the defendant among the papers he noticed them more particularly, that he thought Fifield and the Turners were also named, but that he was not certain as to the Turners — that he found these papers in season by due course of mail, from Boston; that he did not recollect the date, or amount of the protested papers, or the name of the notary — that inquiry was made of him where Garland lived, that he replied that he lived in China, but that he spent considerable time in Bangor, and that they had better inquire if he was not then there. He further testified that China was on the direct mail route from Boston to Bangor, that the mail arrives in China the day preceding its arrival in Bangor, and that after the arrival of the mail at Bangor, no communication by mail could be forwarded to China until the day following.

From the testimony of Samuel Harris, cashier of the Mercantile Bank, it appeared that the draft in suit was left by the plaintiff in the Mercantile Bank for collection, that having no account with the Suffolk Bank, he handed it to the cashier of the Penobscot Bank for collection; that he subsequently received from said cashier (Wyman) a protest and notices which he presumed were on the same draft, that he passed the same over to Ricker to be delivered — and that he had no recollection of the time independently of the protest.

From the testimony of Moses Patten, Jr. it appeared that some time in September, 1836, John S. Ricker inquired of him where the defendant resided, and that (after making inquiry to ascertain) he on the same day, before the close of bank hours informed him that the defendant, resided in China. Said Patten further testified that soon after the protest of the draft, and, as he thought, not more than four or five days from that time, but as to the time he was not certain, he saw the defendant in Bangor and asked him if he knew of it or had notice of it; and that, as he thought, the defendant replied that he did know or had notice of it, and that he would attend to it, or would arrange it.

Upon this evidence the defendant's counsel moved the Court

to order a nonsuit on the ground that the evidence was insufficient in law to maintain the issue on the part of the plaintiff. But PERHAM J. before whom the cause was tried, directed the jury that if they were satisfied, that a demand of payment had been seasonably made, and notice of non-payment had been seasonably made and forwarded to Bangor, and due diligence had been used, after its reception in Bangor, to forward it properly directed to the defendant to his place of residence, it was such a compliance with the law as would charge the defendant, and that it was necessary for the plaintiff to satisfy them on these points by clear and satisfactory evidence.

The defendant's counsel requested the Court to instruct the jury that in order to charge the defendant, the evidence of notice should be direct, explicit, and attended with no uncertainty, and that it should not be left to inference; that the testimony of Ricker was not of that character, and was insufficient in law to prove seasonable notice to the defendant. The Court declined giving the requested instructions further than as appear in the instructions given. The jury returned a verdict for the plaintiff, and exceptions were duly filed to the rulings of the Court.

*Godfrey*, for the defendant. The indorser is responsible only on proof of demand and refusal, and due notice thereof. From the evidence, it does not appear when the notice sent from Boston was received, nor when notice was transmitted to the defendant. The whole matter was left in such doubt and uncertainty that the defendant should not, as a matter of law, have been liable. Upon the proof offered he was not legally liable, and the law should not have been left to the jury. *Warren* v. *Gilman*, 15 Maine R. 136. This being a foreign bill, the protest is the proper evidence. *Phœnix Bank* v. *Hussey*, 12 Pick 483; *Green* v. *Jackson*, 15 Maine R. 136. There is no certainty as to the time when notice was sent, without which the defendant should be discharged. *Lawson* v. *Sherwood*, 1 Stark. 251.

The cashier of the Mercantile Bank was not a holder of the note, nor was he the proper person, not being a party to the

draft, to give the requisite notice to the several parties. Those should have come from a holder. *Stanton* v. *Blossom*, 14 Mass. R. 116; *Roberts* v. *Bradshaw*, 1 Stark. 29.

*J. A. Poor*, for the plaintiff. The notice given was sufficient. *Munn* v. *Baldwin*, 6 Mass. R. 316; *Bank of Utica* v. *Davidson*, 5 Wend. 587; *Meade* v. *Engs*, 5 Cow. 303; *Chapman* v. *Lipscombe*, 1 Johns. 294.

The agreement, testified to by Patten, to pay, is conclusive on the defendant. *Miller* v. *Hackley*, 5 Johns 375; *Reynolds* v. *Douglas*, 12 Pet. 497.

The opinion of the Court was by

Shepley J. — The protest being the only proper evidence of the proceedings of the notary was produced. It appears from it, that notice was sent to the defendant in due season enclosed to Wyman, the cashier of the Penobscot bank. Parol evidence was properly admitted to show, when it was received by the cashier, and what was done with it. Harris, the cashier of the Mercantile bank, says, that he had no doubt, that the protest and notices were seasonably received by him from Wyman, and that he passed them over to Ricker, the clerk, to be delivered. This testimony is sustained by that of Warren. And the jury might fairly conclude, that they were received from Wyman on the day of their arrival at Bangor in due course of mail, from Boston, and immediately passed over to Ricker. Ricker testifies, that on the fifth or sixth of September he received the notices from Harris, and put the one addressed to the defendant into the postoffice at Bangor, directed to him at Bangor or China, he could not state which, but thinks it was at China. The day on which it was placed in the postoffice should be made certain, and if the testimony of this witness were not aided by that of others, it would be insufficient. But, when taken in connexion with the testimony of Harris and Warren, it appears, that the notice came to the hands of Ricker on the day that it was received at Bangor, and on the same day was put into the postoffice.

The testimony of Ricker leaves it uncertain also whether the notice was properly directed to the defendant at China. But when the testimony of Warren and Patten including the statement of the defendant to Patten, that he knew or had notice, that the draft had come back, is considered in connexion with it, the jury would be justified in concluding that it was properly directed.

The testimony exhibits an inattention to dates and a want of accuracy in the persons entrusted to do the business of the bank, very dangerous to the rights of the holders of such paper. And when the present practice of the notaries to forward all notices to the cashier instead of sending them properly directed to each party by mail, is considered, it must be apparent, that the risk to the holders of such paper is greatly increased, and their rights put to extreme hazard by this practice on the part of the notaries. None of the other objections taken at the trial were insisted on at the argument.

*Exceptions overruled.*